UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

PAUL ELMOWSKY,

Defendant.

19-CR-00175 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Defendant Paul Elmowsky ("Defendant" or "Elmowsky") is charged by Indictment on one count of knowingly receiving and possessing a firearm that was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5845(a)(4) and 5861(d). (Indictment, ECF No. 8.) Before the Court is Defendant's Motion to Suppress a firearm seized from his home on December 31, 2018 as well as statements that Defendant made to law enforcement that same day (the "Motion"). (Motion to Suppress, ECF No. 22; Memorandum of Law in Support of Defendant's Pretrial Motions, ("Def. Mem."), ECF No. 24.)

On November 14, 2019, the Court issued an Opinion and Order, granting in part and denying in part Defendant's Motion. (ECF No. 27.) The Court granted the Motion insofar as Defendant sought an evidentiary hearing, and denied it insofar as Defendant sought to dismiss the Indictment and suppress the firearm and any statements, reserving decision on those issues until after the hearing. (*Id.*) Subsequently, on December 16, 2019, the Court held a hearing to assess the outstanding Fourth Amendment and *Miranda* issues raised by the Motion. (*See* ECF Docket Entry dated 12/16/2019.) For the following reasons, Defendant's Motion is DENIED in its entirety.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/19/2020

## BACKGROUND

The following factual findings are based on the parties' briefings, the undisputed testimony presented at the hearing, and the Court's credibility determinations.

On or about late December 2018, law enforcement in Las Vegas, Nevada were alerted to several firearms that had been left in hotel rooms by Elmowsky in violation of hotel policy. (Palazolo Tr. at 9.) Consequently, on December 28, 2018, the Rockland County Sheriff's Department petitioned for the suspension of Elmowsky's pistol permit. (Compl. ¶ 4(a).) On December 31, 2018, Rockland Supreme Court Justice Thomas E. Walsh issued a "Notice of Suspension," which invalidated Elmowsky's pistol permit ("Suspension Notice"). (*See* GX-01.) The Suspension Notice stated that Elmowsky's pistol permit was "suspended," and directed Elmowsky to surrender his permit and weapons "immediately to the Rockland County Sheriff's Department." (*Id.*)

That same day, December 31, 2018, the Rockland County Sheriff's Office ("RCSO"), New York City Police Department ("NYPD") and Orangetown Police Department ("OPD") met at the OPD's office to brief the background regarding the Suspension Notice and coordinate service on Elmowsky. (Palazolo Tr. at 31–33.) In the officers' assessment, the circumstances surrounding this Suspension Notice warranted heightened concern, given the sheer number of firearms expected to be in Elmowsky's possession, as well as Elmowsky's behavior during a prior encounter at his home during which he appeared to be intoxicated.[1] (*Id.* at 10, 37, 50-51; Garrison Tr. at 63; Sullivan Tr. at 105.)

---

[1] Prior to December 31, 2018, the NYPD visited Elmowsky at his home to speak with him. There is some uncertainty as to when this earlier visit occurred. (*See* Palazolo Tr. at 50) ("I believe it was a few days prior"); (Garrison Tr. at 91) (NYPD visit occurred "weeks before.")

## I. Initial Encounter and Entry into Defendant's Home

Officers from those three law enforcement agencies went to Elmowsky's home in Nyack, NY to serve the Suspension Notice at approximately 3:15pm.[2] (Palazolo Tr. at 11; Garrison Tr. at 64; Sullivan Tr. at 96; Baisley Tr. at 121.) OPD Officers Matthew Sullivan ("Officer Sullivan") and Greg Baisley ("Officer Baisley"), who were both in uniform, approached the house, while OPD Sergeant Anthony Palazolo ("Sergeant Palazolo") parked in a marked patrol unit on the street opposite the Elmowsky's residence, with additional officers staged down the road. (Palazolo Tr. at 57; Garrison Tr. at 63, 65; Sullivan Tr. at 106; Baisley Tr. at 120–21.) Officer Sullivan knocked on the door, which had glass windows such that it was possible to see a man through the glass. (Sullivan Tr. at 96–97; Baisley Tr. at 121.) Officer Sullivan verbally identified himself, and the man behind the door pointed to his left toward the garage. (Sullivan Tr. at 97; Baisley Tr. at 121.) The garage door then opened. (Sullivan Tr. at 97.) As Officer Sullivan and Officer Baisley stood in the driveway, Officer Sullivan again stated he was Officer Sullivan from the Orangetown Police and that the officers needed to talk to Elmowsky. (*Id.* at 97.)

At this point, Elmowsky asked Officer Sullivan to see his police identification, but Officer Sullivan explained that he did not carry such identification. (*Id.* at 97; Baisley Tr. at 121–22.) Instead, Officer Sullivan replied that Elmowsky could call the police station to verify their presence. (Sullivan Tr. at 97; Baisley Tr. at 121–22.) Officer Sullivan then asked Elmowsky to see his identification, to which Elmowsky replied, "Okay, come on in." (Sullivan Tr. at 98; Baisley Tr. at 122.) Elmowsky then began walking inside the garage and Officers Sullivan and Baisley followed. (Sullivan Tr. at 97.) Elmowsky entered a doorway from the garage into the kitchen

---

[2] While the Suspension Notice lists a Wesley Hills, NY address for Elmowsky, Sergeant Paul Garrison testified that the address on the court paperwork is not always up-to-date, and the officers instead used the address for Elmowsky provided on their dispatch computer. (Garrison Tr. at 64–65.)

3

pantry and said, "I'm getting my I.D., follow me." (*Id.* at 98, 110.) After Sergeant Palazolo saw Officer Baisley and Officer Sullivan enter the garage, Sergeant Palazolo followed. (Palazolo Tr. at 11–12.) When Elmowsky again asked for Officer Sullivan's identification, Officer Sullivan suggested that Elmowsky could speak with Sullivan's supervisor, and gestured to Sergeant Palazolo. (Palazolo Tr. at 12, 40–41; Sullivan Tr. at 97–98.)

Sergeant Palazolo asked Elmowsky if he could enter Elmowsky's home, and Elmowsky said he could. (Palazolo Tr. at 12.) Sergeant Palazolo asked Elmowsky if he had any weapons on his person and if he could check, to which Elmowsky responded that he could check. (*Id.* at 12–13.) Sergeant Palazolo testified that he conducted a pat-down and felt a bulge in Elmowsky's back pocket that seemed to be a phone. (*Id.* at 13.) Sergeant Palazolo asked Elmowsky if they could go sit down and talk somewhere, and Elmowsky proceeded to the living room. (*Id.* at 13.)

## II. Service of Pistol Permit Suspension Notice

At this time, Sergeant Paul Garrison ("Sergeant Garrison") of the RCSO was stationed at a cross-street down the block from Elmowsky's residence. (Garrison Tr. at 65.) The OPD officers notified Sergeant Garrison over their radio that the scene was safe and secure. (*Id.*) Sergeant Garrison proceeded to pull into Elmowsky's driveway and entered the living area of the home. (*Id.*) He identified himself and read the Suspension Notice aloud to Elmowsky, pausing several times to ask if Elmowsky understood. (*Id.* at 66, 80.) After conveying its sum and substance, Sergeant Garrison stopped reading the Suspension Notice, provided Elmowsky with a copy of the notice, and asked Elmowsky if he understood and was willing to comply. (*Id.* at 66–68; Palazolo Tr. at 14.) Elmowsky responded in the affirmative. (Garrison Tr. at 68, 86; Palazolo Tr. at 14; Sullivan Tr. at 99.) Sergeant Garrison testified that he did not record in his notes that he had read the Suspension Notice out loud. (Garrison Tr. at 80–83.)

### III. Recovery of Firearms and Defendant's Arrest

As the search for the guns began, there were approximately 8–10 officers in Elmowsky's residence. (Garrison Tr. at 85; Baisley Tr. at 126, 135.) Officer Sullivan asked Elmowsky if he could search the couch for firearms. (Sullivan Tr. at 99.) Officer Sullivan testified that Elmowsky agreed, and "was being cooperative." (*Id.* at 99–100.) Officer Sullivan did not locate any firearms on the couch. (*Id.* at 100.)

Sergeant Garrison explained that he would need Elmowsky's assistance to track down the firearms listed in Elmowsky's permit, and Elmowsky explained that he had guns scattered throughout the house and that the officers were welcome to go look for them. (Garrison Tr. at 68; Palazolo Tr. at 14; Baisley Tr. at 123.) Elmowsky mentioned that he believed he had a Glock pistol in one of the bedrooms. (Palazolo Tr. at 14.) Sergeant Palazolo asked for permission to retrieve it, and Elmowsky consented. (*Id.* at 14.) Upon a search of the room Sergeant Palazolo did not locate a Glock but did retrieve a revolver. (*Id.* at 15.) Elmowsky suggested Sergeant Palazolo check one of the drawers at the end table next to the bed, where Sergeant Palazolo recovered a Glock 27 pistol. (*Id.* at 16–17.)

In the meantime, after Elmowsky had invited the officers to search for the firearms in the house, Officer Baisley entered a bedroom and lifted the foot of the mattress, where he found an AR-15 silver handgun. (Baisley Tr. at 124.) Officer Baisley surveyed the rest of the room but did not found any other guns. (*Id.* at 125.)

Elmowsky also went on to state that he had a safe in his bedroom that contained the keys to other safes where pistols might be found. (Palazolo Tr. at 17.) Sergeant Palazolo and Officer Sullivan followed Elmowsky to the bedroom, where Elmowsky tried unsuccessfully to open the safe in the bedroom. (*Id.* at 17.) They then proceeded to the garage, where they were also

unsuccessful at opening the safes there. Elmowsky stated that the pin code to the safes might be obtained from his brother-in-law, Mike, who might have changed the codes. (Palazolo Tr. at 18; Garrison Tr. at 69–70; Sullivan Tr. at 101.) Sergeant Palazolo subsequently asked if he could try getting into the bedroom safe himself. Elmowsky gave him the key for that safe, and Sergeant Palazolo was able to open it and obtain its contents: a plastic bag with two keys. (Palazolo Tr. at 19; Sullivan Tr. at 101.) As Sergeant Palazolo went out to the garage with the two keys, Elmowsky and Officer Sullivan returned to the living room. (Sullivan Tr. at 102.) Elmowsky and Officer Sullivan then had a conversation about Elmowsky's personal interest in photography and the artwork in his home. (*Id.*)

Once in the garage, Sergeant Palazolo used the two keys obtained from the bedroom safes to open the safes in the garage. (Palazolo Tr. at 19.) Inside the garage safes, the officers found a number of firearms, including a short-barrel rifle, an Uzi 9-millimeter firearm (the "Uzi"), a weapon not registered to Elmowsky in the National Firearms Registration and Transfer Record. (*Id.* at 20, 24–25.) (Compl. ¶¶ 4(c), 5.) (Palazolo Tr. at 24; *see* GX-04.) The officers also recovered, among other things, an AK-pattern rifle and an M1 carbine, which have the ability to accept a detachable magazine, possession of which Palazolo believed to be a felony in the State of New York. (Palazolo Tr. at 20–24.) Sergeant Palazolo notified Sergeant Garrison and Detective Lieutenant Larsky from the local township department that some of the guns in the safes were illegal. (*Id.* at 21.) Sergeant Garrison testified that there were some weapons on Elmowsky's pistol permit that were unaccounted for (*i.e.*, the officers could not locate them in Elmowsky's residence.) (Garrison Tr. at 71, 74.)

Because Elmowsky possessed illegal assault weapons, Sergeant Garrison informed Elmowsky that he was going to be placed under arrest. (Garrison Tr. at 72; Sullivan Tr. at 102.)

At around 5:00pm, Sergeant Garrison then handcuffed and arrested Elmowsky. (Garrison Tr. at 72, 88.)

## IV. Events Occurring After the Arrest

While the officers took inventory of the firearms in the garage safes, Elmowsky was escorted out of the residence. (Palazolo Tr. at 29; Garrison Tr. at 70–72.) (*See* GX-05) (list of firearms recovered.) The officers did not ask Elmowsky any questions with regard to criminal activity after arresting him. (Garrison Tr. at 88.)

By the end of the encounter, there were between 10–11 officers at or nearby Elmowsky's residence. (Palazolo Tr. at 26.) In addition, officers were assigned to Elmowsky's residence to stay outside the house and make sure no one entered while they awaited clearance of and until their request for a search warrant was authorized. (Garrison Tr. at 73–74.)

The next day, on January 1, 2019, because the officers did not find all of the pistols listed on Elmowsky's permit, they applied for, obtained, and executed a warrant to search Elmowsky's home and cars. (Garrison Tr. at 74; Government's Response to Defendant's Motion ("Gov. Opp.", ECF No. 26, at 6.) The Sheriff's Department returned to Elmowsky's residence with the search warrant. (Palazolo Tr. at 55–56.)

On January 24, 2019, officers arrested Elmowsky on the basis of a one-count complaint charging him with possession of the Uzi. (*Id.*) On March 14, 2019, a grand jury returned an indictment charging Elmowsky with violations of 26 U.S.C. §§ 5845(a)(4) and 5861(d). (Indictment, ECF No. 8.)

## DISCUSSION

In the instant Motion, Elmowsky seeks to suppress the Uzi on the ground that the officers did not have a warrant to search his home and he did not consent to the search, therefore the search

violated the Fourth Amendment and the Uzi should be considered "fruit from the poisonous tree." (*See* Def. Mem. at 2–5.) Elmowsky also seeks to suppress all statements that he made to the officers on December 31, 2018, on the ground that he was in custody for *Miranda* purposes, but was not advised of his rights before he was interrogated. (*See id*. at 5–9.)

The Government opposes Elmowsky's Motion by arguing that (i) Elmowsky voluntarily consented to the search of his home; and (ii) Elmowsky's December 31, 2018 statements were not the product of custodial interrogation. (*See* Gov. Opp. at 6–17.)

### V. <u>Suppression of the Uzi</u>

#### a. Legal Standard

The Fourth Amendment protects individuals against "unreasonable searches and seizures" of their homes. U.S. Const. Amend. IV. In general, searches and seizures are unreasonable and invalid unless based on probable cause and executed pursuant to a warrant. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). If a person consents to a search of his or her home, however, a warrantless search may be valid. *See United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993). Consent may be inferred from an individual's words, acts, or conduct. *Id.* at 883.

Consent must be voluntary and "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228. The government bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *United States v. Snype*, 441 F.3d 119, 130–31 (2d Cir. 2006). The voluntariness of consent is determined by reference to the "totality of all the circumstances." *United States v. Isiofia*, 370 F.3d 226, 230 (2d. Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227). Furthermore, the standard for measuring the scope of a suspect's consent is "objective reasonableness," which prompts the inquiry: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?"

8

*United States v. O'Brien*, 926 F.3d 57, 76–77 (2d Cir. 2019) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)) (internal quotation marks omitted).

### b. Analysis

It is undisputed that the law enforcement officers did not obtain a warrant prior to the December 31, 2018 search of Elmowsky's home. Elmowsky maintains that he did not provide consent to the search of his home, and that any purported consent was not voluntary. Specifically, Elmowsky argues any consent given was not "the product of his free and unconstrainted choice" for several reasons: (i) 15–20 officers "stormed" his house with "guns drawn," (ii) the agents attempted to execute the Suspension Order as if it were a warrant, and (iii) they handcuffed Elmowsky. (Def. Mem. at 8–9.) Elmowsky also questions the officers' decision to "sit on" his house overnight. (*Id.* at 9.)

By contrast, the Government contends that, by his words and actions, Elmowsky consented to the entry and search, that Elmowsky's consent was voluntary, and that, when viewed in the totality of the circumstances, the officers reasonably believed they had consent to search Elmowsky's home for weapons. (Gov. Opp. at 7.) This position is supported by the undisputed testimony presented at the hearing.

To start with, the officers did not storm through Elmowsky's front door. (Garrison Tr. at 74; Sullivan Tr. at 103; Baisley Tr. at 126.) Instead, as Officers Sullivan and Baisley testified, after a very brief conversation in Elmowsky's driveway, Elmowsky explicitly invited them into his home. (Sullivan Tr. at 98, 110; Baisley Tr. at 122.) When Sergeant Palazolo followed shortly afterward and asked Elmowsky if he could entered the home, Elmowsky said that he could. (Palazolo Tr. at 12.)

9

Subsequently, Sergeant Garrison read Elmowsky the Suspension Notice and sought confirmation that Elmowsky understood its terms. (Garrison Tr. at 66–68, 86; Palazolo Tr. at 14; Sullivan Tr. at 99.) Elmowsky responded that he did understand, and gave his permission to the officers to search the house for the firearms. (Garrison Tr. at 68; Palazolo Tr. at 14; Baisley Tr. at 123.) (*See also* Garriston Tr. at 89–90) (Garrison testified, "I asked do you understand and will he cooperate. [Elmowsky responded,] 'Yes. Yes, I understand.'") At or about the time when Garrison was reading the notice, the officers did not make any effort to restrict Elmowsky's movement. (Sullivan Tr. at 112.) As Sergeant Garrison explained, "He was totally compliant." (Sullivan Tr. at 112.)

Elmowsky never asked the officers to leave, or to stop looking for and collecting the guns in his house. (Palazolo Tr. at 28–29; Garrison Tr. at 75; Sullivan Tr. at 104; Baisley Tr. at 127.) At no point during the execution of the pistol permit did Palazolo, Garrison, or any of the other officers have their guns drawn. (Palazolo Tr. at 26; Garrison Tr. at 74; Sullivan Tr. at 103; Baisley Tr. at 126.) None of the officers shouted at Elmowsky, raised their voice when they were speaking with him, or otherwise threatened him. ((Palazolo Tr. at 26; Garrison Tr. at 75; Sullivan Tr. at 103; Baisley Tr. at 126.) Instead, Elmowsky appeared to remain calm throughout and demonstrated his willingness to turn over the firearms on the permit. (Palazolo Tr. at 29) (Q: How would you describe the Defendant's demeanor while you were interacting with him? A: He was helpful. He provided us keys and codes. I think as happy as anyone could be if your pistol permit has been suspended.) (Garrison Tr. at 76.) ("He was calm and he was fine.") (Sullivan Tr. at 104) ("He was very helpful. He even said he wanted to donate the guns to the police.") (Baisley Tr. at 127) ("He was calm and cooperative.")

In consideration of the totality of the circumstances, the Court finds that Elmowsky voluntarily consented to the entry and search, and that the officers reasonably believed they had consent to search Elmowsky's home for weapons. Elmowsky clearly invited the officers into his home. After being read the Suspension Notice, Elmowsky stated that he understood it and told the officers they could search for the guns. He proceeded to direct them to where the guns were located, and actively assisted with the search. While there were approximately 8–10 officers present at the conclusion of the encounter, (Baisley Tr. at 126, 135), Elmowsky's demeanor and conduct indicated that he was not coerced or intimidated by the officers. *See United States v. O'Brien*, 926 F.3d 57, 78 (2d. Cir. 2019) (denying suppression motion because, *inter alia*, the record indicated Defendant was not intimidated by the officers conducting the search and that Defendant voluntarily consented to the search). As such, Elmowsky's application to suppress the Uzi recovered during the search is denied.

## VI. Suppression of Defendant's Statements

### a. Legal Standard

Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights. *Miranda v. Arizona*, 384 U.S. 436, 448–50 (1966). In determining whether a suspect was in custody, a court "looks at all the surrounding circumstances." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Specifically, a two-part objective test asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir.

2004) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

Although both elements are required, the second is the "ultimate inquiry" because a "free–to–leave inquiry reveals only whether the person questioned was seized." *Newton*, 369 F.3d at 672 (internal quotation omitted). An individual's subjective belief about his or her status generally does not bear on the custody analysis. *Faux*, 828 F.3d at 135. Nor do the officers' perceptions, although they "bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Stansbury v. California*, 511 U.S. 318, 325 (1994) (quotation marks and citations omitted).

An individual who understands that his detention is "not likely to be temporary and brief" and feels that he is "completely at the mercy of police" could reasonably deem his situation comparable to formal arrest. *Newton*, 369 F.3d at 675 (quoting *Berkemer*, 468 U.S. at 437–38). Relevant considerations include: (1) "the interrogation's duration"; (2) "its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion." *U.S. v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). Ultimately, however, all factors must be weighed, and no one factor is dispositive; rather the court must assess whether the circumstances would tend to make an individual reasonably feel as though they were being questioned in a police-dominated setting. *See Newton*, 369 F.3d at 675 (explaining that the animating concern behind the various factor tests used to assess "custody" for *Miranda* purposes is coercive interrogation techniques.)

### b. Analysis

It is undisputed that Elmowsky was questioned without *Miranda* warnings on December 31, 2018. Defendant maintains that this questioning constituted a custodial interrogation and the statements he made must be suppressed. Defendant argues that he "reasonably and sensibly believed he was not free to leave" because (i) 15–20 officers stormed his house with guns drawn, (ii) Defendant was handcuffed, (iii) he was not allowed to leave, (iv) the officers did not tell him he was free to leave, and (v) deputies were posted to "sit on" his home overnight. (Def. Mem. at 6–7.) The Government disagrees, contending that Defendant was not in custody at the time of his December 31, 2018 statements, and, accordingly, the officers were not required to provide *Miranda* warnings prior to speaking with him.

In consideration of the factors summarized in *FNU LNU*, 653 F.3d at 153, the Court finds that a reasonable person in Elmowsky's situation would have thought he was free to leave the police encounter at issue, and would not have understood his freedom of action to have been curtailed to a degree associated with formal arrest.

*First*, the duration of the encounter was relatively brief. It was less than two hours from when the officers arrived, at or around 3:15pm, to Elmowsky's arrest at or around 5:00pm. Furthermore, the officers only questioned Elmowsky regarding the location of the weapons after he had provided his consent to the search of his home and chose to actively cooperate with the search.

*Second*, the encounter took place at Elmowsky's home. Elmowsky was free to speak with the officers outside his home; instead, he opened the garage door and invited them into the premises. He was subjected to "neither the inconvenience nor the indignity associated with a

compelled visit to the police station." *Newton*, 369 F.3d at 675 (quoting *Michigan v. Summers*, 452 U.S. 692, 702 (1981).

*Third*, Elmowsky volunteered his assistance to the officers who were searching for the guns. Elmowsky never asked to leave, nor did he ask the officers to leave his house. Instead, at each turn, he assisted in the search by identifying the potential locations of the guns and attempting to open the safes.

*Fourth*, the officers testified that they did not use restraints until Elmowsky was arrested at the conclusion of the encounter, after which he was not questioned about criminal activity. As Sergeant Palazolo, Sergeant Garrison, Officer Sullivan and Officer Baisley testified, the Defendant was not handcuffed while they collected his guns. He was not confined to a particular place. Instead, he moved with them about the house.

*Fifth*, each officer testified that weapons were not drawn during the encounter. They also did not threaten the Defendant or raise their voice or hear anyone else do so.

*Finally*, the officers did not specifically tell Elmowsky that he was free to leave, however, Elmowsky was informed that the officers were there solely to collect his guns. Any questions that were asked by law enforcement were aimed at determining the location of Elmowsky's guns or determining how to access the locations where guns were stored.

Taken together, the Court finds that a reasonable person would not deem Elmowsky's brief encounter with the law enforcement officers to be comparable to one of formal arrest. *See Newton*, 369 F.3d at 675. Because Elmowsky was not subjected to a custodial interrogation, no *Miranda* warning was necessary, and the application to suppress Elmowsky's statements must therefore be denied.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Motion in its entirety.

Dated: March 19, 2020
       White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge